IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

KIMBERLY S DORNES,

      Plaintiff,

vs.                                    Case No. 1:14-cv-114-WS-GRJ

CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,

      Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying Plaintiff's applications for disability insurance benefits and supplemental security income. Doc. 1. The Commissioner has answered, Doc. 8, and both parties have filed briefs outlining their respective positions. Docs. 11, 14. Upon due consideration, and for the reasons discussed below, the undersigned recommends that the Commissioner's decision be affirmed.

## I. PROCEDURAL HISTORY

Plaintiff applied for a period of disability, disability insurance benefits (DIB) and supplemental security income (SSI), alleging disability since June 1, 2008. (R. 211-23, 72-83, 84-95.) Her applications were denied initially, and upon reconsideration. (R. 96-97, 98-106.) Plaintiff then requested a hearing by an administrative law judge ("ALJ"). (R. 107-08.) After the hearing, Plaintiff's applications were denied with an unfavorable

decision dated April 9, 2013.  (R. 19-29.)  The Appeals Council denied Plaintiff's

request for review.  (R. 1-3.)  This action followed.

## II.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial

evidence.[1] Substantial evidence is more than a scintilla, i.e., the evidence must do more

than merely create a suspicion of the existence of a fact, and must include such

relevant evidence as a reasonable person would accept as adequate to support the

conclusion.[2]

Where the Commissioner's decision is supported by substantial evidence, the

district court will affirm, even if the reviewer would have reached a contrary result as

finder of fact, and even if the reviewer finds that the evidence preponderates against

the Commissioner's decision.[3] The district court must view the evidence as a whole,

taking into account evidence favorable as well as unfavorable to the decision.[4]

However, the district court will reverse the Commissioner's decision on plenary review if

---

[1] *See* 42 U.S.C. § 405(g) (2000).

[2] *Foote v. Chater*, 67 F.3d 1553, 1560 (11ᵗʰ Cir. 1995) (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11ᵗʰ Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); *accord, Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11ᵗʰ Cir. 1991).

[3] *Edwards*, 937 F.2d at 584 n.3; *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11ᵗʰ Cir. 1991).

[4] *Foote*, 67 F.3d at 1560; *accord, Lowery v. Sullivan*, 979 F.2d 835, 837 (11ᵗʰ Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11ᵗʰ Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[5]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6]  The impairment must be severe, making a claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy.[7]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[8]  The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[9]  The Commissioner may satisfy this burden

---

[5] *Keeton v. Dep't Health and Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505(a) (2012) (All further references to 20 C.F.R. will be to the 2012 version unless otherwise specified.).

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[8] *Walker v. Bowen,* 826 F.2d 996, 1002 (11th Cir. 1987); *see also Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001).

[9] *Doughty*, 245 F.3d at 1278 n.2. In *Doughty* the court explained this burden shifting as follows:

> In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.) (Internal citations omitted).

by pointing to the Medical-Vocational Guidelines (the "Grids") for a conclusive determination that a claimant is disabled or not disabled.[10]

However, the ALJ should not exclusively rely on the Grids when "the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion."[11]   In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[12]

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[13]   Such independent evidence may be introduced by a Vocational Expert's ("VE") testimony, but this is not the exclusive means of introducing such evidence.[14]   Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.

---

[10] *Walker*, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

[11] *Wolfe v. Chater*, 86 F.3d 1072, 1077 ( 11th Cir. 1996). *See Jones v. Apfel*, 190 F.3d 1224, 1229 (11th Cir. 1999); *Walker*, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[12] *Walker*, 826 F.2d at 1003.

[13] *Wolfe*, 86 F.3d at 1077-78.

[14] *See id.*

Age is a vocational factor considered by the Commissioner in determining if a claimant is disabled.[15]  The rules and Grids take into consideration that advancing age increasingly limits a persons ability to adjust to other work.[16] Therefore, as a claimant ages, the likelihood of being found disabled increases.[17]  The Commissioner, however, may not apply the age categories mechanically in a borderline situation, and may apply an older age category if the claimant is a few weeks or months away from an older age category.[18]

## III. SUMMARY OF THE RECORD

### A. Hearing Testimony

The ALJ conducted a hearing on March 1, 2013.  Plaintiff testified that she completed high school and her healthcare was paid for by her brother.  She did not have health insurance.  (R. 36-39.)

Plaintiff testified about her employment with Sioux Plastics, where she ran an injection molding machine that produced plastic items.  She also worked for L&W Engineering Company, where she measured metal tubes coming off a press and put them into a container.  Plaintiff also worked for Recellular Incorporated, where she installed programs onto cell phones.  (R. 39-44.)

---

[15]20 C.F.R. § 424.1563(a).

[16]See 20 C.F.R. Pt. 404, subp. P, Appx .2.

[17]20 C.F.R. § 424.1563(a).

[18]20 C.F.R. § 424.1563(b).

Plaintiff last worked in 2011, and her employment ended because she had a verbal altercation with her boss.  She attempted to find work after that as a janitor because she did not like people.  Plaintiff testified that she was unable to return to work because she did not like people, she always seemed to get in trouble, she could not think straight and her mind would race.  She also said that her medication made her feel foggy.  Plaintiff currently was not seeing any healthcare providers because she had recently moved to Gainesville.  (R. 44-46.)

Plaintiff testified that she had gaps in her treatment because she was moving around.  Her brother bought her a plane ticket to live in Minnesota where her daughter lived but it did not work out. Consequently Plaintiff returned to Florida, driving for about four days. She slept in rest stops during her drive. (R. 46-50.)

Plaintiff testified that she was taking Seroquel, Trazadone, and Celexa.  As side effects she stated that she experienced sore muscles, tiredness, and had trouble remembering things.  Plaintiff smoked about a half pack of cigarettes a day, although she was trying to quit.  She did not currently drink alcohol, but did so previously, before she was on medication.  (R. 50-53.)

Plaintiff stated that she had trouble getting along with people, especially in groups.  She felt like "a rat in a cage."  She lived with her brother and sister in law.  During a typical day Plaintiff would make coffee, smoke a cigarette, watch the news, crochet, make lunch, play with the dogs, and maybe weed the garden.  The dogs belonged to her brother but she fed them.  Plaintiff was also able to take care of her personal needs, like bathing and dressing.  She could make simple meals, perform chores around the house, and grocery shop.  Plaintiff did not leave the house often, but

she could drive when she did.  As far as hobbies, Plaintiff liked to crochet and fish, but she did not belong to any clubs or social groups. (R. 53-56.)

Upon questioning from her attorney, Plaintiff stated that she had problems in almost all of her previous jobs. She stated that she would just "go off" if one of her coworkers or her boss made her angry, or told her how to do her job or said the wrong thing to her.  She said this might happen twice a month or more.  She got along well with her brother, sister in law, and a neighbor, but did not leave the house often, perhaps twice a month.  (R. 56-59.)

Plaintiff stated that since her onset date she was not able to complete tasks as well. She would put things down after she started and not return to them for weeks. She said this happened because she was tired and did not feel like doing anything.  Her mind would race but her body would not get up and do anything.  She stated that her mind would go in fifty different directions and she could not concentrate as well, and she did not sleep well at night.  (R. 59-61.)

Plaintiff testified that she was referred to Meridian Behavioral because she was bipolar and could get violent.  She testified that she was violent mostly with her ex-husbands and with her sister.  With others she mostly just yelled.  (R. 61-63.)

A Vocational Expert (VE) also testified at the hearing.  The VE testified that Plaintiff had past relevant work as an injection molding machine tender, which was light and unskilled work.  She also had past work as a machine operator II, which was medium and semi-skilled, and as an electronics assembler, which was light and semi-skilled.  (R. 63-64.)

The ALJ asked the VE to assume a person of the same age, education, and work background as Plaintiff, with the ability to work at all exertional levels, but was limited to simple, routine and repetitive tasks involving only simple work related decisions and routine workplace changes, and only occasional interaction with the public, coworkers, and supervision.  (R. 64-65.)

The VE testified that such an individual could perform Plaintiff's past relevant work as both generally and actually performed.  The VE also identified other jobs in the national economy that Plaintiff could perform including commercial or institutional cleaner, hospital cleaner, housekeeping cleaner, and marker.  (R. 65-67.)

The ALJ asked the VE if a person exceeded one or more of the employer tolerances on allotted breaks and off-task time on a consistent basis whether that person would be able to maintain employment.  The VE stated that there would be no ability to maintain employment.  (R. 67-68.)

Plaintiff's attorney asked the VE whether that person would work if marked restrictions on social limitations, such as accepting instructions, responding appropriately to criticism and the ability to get along with coworkers, was added to the hypothetical.  The VE testified that such a hypothetical would result in no work.  (R. 68-70.)

### B.  Medical Record Evidence

Because Plaintiff's appeal focuses on her mental impairments, the Court's summary will focus on those records.

Plaintiff was treated at Family Medical Center of Lenawee between December 19, 2009 and August 2011. Those records disclose that Plaintiff was diagnosed with

biopolar disorder, depression and anxiety.  Notes from the Family Medical Center dated

January 19, 2010, show that Plaintiff was taking Paxil, which improved her mood but

caused weight gain.  Records from March 9, 2010, reflect that Plaintiff doubled her

Celexa on her own and found it effective.  Plaintiff was advised not to self-adjust her

own medication again. Plaintiff treated with Annemarie Kallenbach, RN CNP on July 13,

2011, and reported that because Celexa was making Plaintiff's bipolar worse she was

started on Seroquel. On July 27, 2011, Plaintiff reported to B. Lopez, LMSW at Family

Medical Center that she was taking Tylenol twice a day because the Seroquel was

making her body ache.  On August 10, 2011, Plaintiff reported that her global body pain

had increased since starting Seroquel about a month prior.  It was planned to begin

Cymbalta when Plaintiff was feeling less anxious, and reduce her dose of Seroquel.

Notes dated August 24, 2011, reflect that Plaintiff stated she was feeling better with

Seroquel, and much more mellow.  (R. 340-51.)

   During her gap in treatment with Family Medical Center, Plaintiff treated with

Mayo Health System in Minnesota.  On November 5, 2010, Plaintiff presented for a

medication check. She stated that she had increased irritability since discontinuing Paxil

and that she cannot focus. Plaintiff was started on bupropion SR 150 milligrams per

day.  Plaintiff followed up on November 16, 2010, and stated she was doing "wonderful"

and had found a new job.

   On February 15, 2011, Plaintiff presented for a recheck. She reported being

stressed, but was in no apparent distress.  She was able to carry on a conversation with

ease.  On September 14, 2012, Plaintiff reported to Mayo Health System to reevaluate

her medications. She complained that Wellbutrin was making her feel uneasy. She was started on Celexa in addition to Seroquel.  (R. 429-51.)

Plaintiff underwent a psychiatric/psychological consultative medical examination on September 29, 2011, with Elizabeth Bishop, Ph.D.  Plaintiff reported that she had been married four or more times, was bipolar, could not maintain her finances, and was experiencing anxiety attacks.  Plaintiff was a low average student, but was not in special education. Plaintiff stated that she stopped work in 2008 to care for her granddaughter. Dr. Bishop noted that Plaintiff "related openly and appropriately" with her, had good reality contact, was pleasant and able to describe her symptoms clearly.  Plaintiff's speech was clear and logical.  Plaintiff said she had some suicidal ideations but no plans, and had no hallucinations or delusions.  Plaintiff experienced feeling "hyper" with a racing heartbeat and sweating, but her panic attacks no longer happened now that she was isolating herself.  Plaintiff used to have nightmares and flashbacks about her abusive childhood, but with medication she could now sleep five to six hours per night. (R. 361-63.)

Dr. Bishop diagnosed Plaintiff with bipolar disorder, post traumatic stress disorder, panic attacks without agoraphobia, and alcohol dependence in sustained full remission.  Dr. Bishop concluded that "given her bipolar disorder, panic attacks, and history of PTSD, she is likely to have difficulty maintaining fully employment."  She gave plaintiff a "guarded" prognosis and noted she was in need of mental health treatment. (R. 363-64.)

Plaintiff reported to Azalea Health on February 5, 2013, for a refill of her Celexa. Plaintiff was given a refill and advised to establish with Meridian, as she had been previously advised.  (R. 371-76; 382.)

Plaintiff was seen for a psychiatric evaluation at Meridian Behavioral on March 21, 2013.  She was admitted because of self-reported suicidal ideations.  After admission she stated that she reported suicidal ideations so that she could get back on medication.  Plaintiff stated that Seroquel and Celexa helped her, so that she felt like a different person when on medication.  Her medication was restarted, and she returned to Meridian on April 9, 2013, for a followup. At the followup she reported feeling anxious and depressed.  Plaintiff's  prescriptions were increased and she was instructed to return in four weeks.  (R. 532-44.)

### C.  The ALJ's Decision

The ALJ determined that Plaintiff met the insured status requirements through June 30, 2015, and that she had not engaged in substantial gainful activity since the alleged onset date though she worked.  The ALJ found that Plaintiff had the severe impairments of: bipolar I disorder, post traumatic stress disorder in partial remission, and panic attacks, none of which met or equals the Listings singly or in combination.

The ALJ found that Plaintiff had the RFC to perform the full range of work at all exertional levels, except that she was limited to simple, routine, and repetitive tasks involving only simple work related decisions, and routine workplace changes with only occasional interaction the public and coworkers and only occasional supervision.

In reaching this conclusion, the ALJ only partially credited Plaintiff's complaints, but discredited them to the extent that they were inconsistent with the RFC.

Relying on testimony from the VE, the ALJ found at step four of the sequential analysis that Plaintiff was capable of performing her past relevant work. Alternatively, the ALJ found at step five that Plaintiff was capable of performing other work existing in substantial numbers in the national economy.  Accordingly, the ALJ determined that Plaintiff was not under a disability through the date of the decision.  (R. 19-29.)

## IV. DISCUSSION

Plaintiff raises only one challenge on appeal. Plaintiff challenges the ALJ's determination that despite her mental health impairments, Plaintiff could perform work on a regular, full-time basis in light of the opinion from Dr. Bishop, the consultative examiner.  The standard of review applied by the Court is whether the Commissioner's findings are supported by substantial evidence. The primary problem with Plaintiff's argument is that she focuses on the impairments themselves, noted by the mental health professionals, rather than upon the functional limitations caused by the impairments. The law applicable to Social Security disability claims requires the ALJ to measure the severity of a claimant's impairments based upon their effect on the claimant's ability to work, and not on the impairments themselves. *See,* 20 C.F.R. § 404.1545(a); *McCruter v. Bowen*, 791 F. 2d 1544, 1547 (11th Cir. 1986).

In determining Plaintiff's impairments and formulating the RFC, the ALJ reviewed Plaintiff's medical records in detail, including her mental health records. The ALJ also appropriately considered and discussed Plaintiff's activities of daily living in evaluating Plaintiff's RFC.  (R. 19-29.)

The ALJ concluded that Plaintiff could perform work at all exertional levels—a conclusion Plaintiff has not challenged—subject to the restrictions that work should  be

limited to simple, routine, and repetitive tasks involving only simple work related
decisions, and routine workplace changes with only occasional interaction with the
public and coworkers and only occasional supervision.  In making this determination the
ALJ recognized that Plaintiff had moderate limitations in concentration, persistence or
pace, as well as mild difficulties in the areas of activities of daily life and maintaining
social functioning.

The notes from Plaintiff's mental health examinations support this finding.  While
recognizing these limitations the ALJ relied upon the medical notes from the Lewanee
Family Medicine Clinic, which showed that Plaintiff was alert, well-oriented, and in no
acute distress.  (R. 348-49.)  Plaintiff was able to converse with and describe her
symptoms to her providers and was cooperative in examinations.  (R. 358.)  Despite her
claim that she did not get along well with others, she was able to relate openly and
appropriately to Dr. Bishop.  (R. 362.)

The ALJ also pointed to the fact that Plaintiff was able to watch television and
crochet, each of which is an activity that demonstrates Plaintiff was able to concentrate.
As evidence that Plaintiff could perform work with the limitations the ALJ assessed, the
ALJ also pointed to the fact that Plaintiff got along well with her brother and sister in
law, and her neighbor.  Furthermore, the ALJ found that Plaintiff's ability to drive and
shop for groceries independently, as well as take care of her personal needs and care
for her grandson, support the ALJ's conclusion that Plaintiff could perform work with the
restrictions included in the RFC.

In evaluating the functional limitations from Plaintiff's metal impairments the ALJ
further relied upon the substantial evidence of record that Plaintiff failed to follow-up

with all treatment recommendations, as evidenced by her multiple gaps in treatment, and her self-adjustment of her medications.

And while Plaintiff points to the opinion of consultative examiner Elizabeth Bishop, Ph.D. that Plaintiff may have difficulty maintaining employment, Dr. Bishop's report failed to identify any specific mental functional limitations that in her opinion would make it difficult maintaining employment.  Thus, rather than identifying specific mental functional limitations (as opposed to diagnoses) Dr. Bishop's report merely provides a legal conclusion on employability, an issue that is reserved for the Commissioner and therefore is due no weight.  (R. 363-64.)

Putting aside Dr. Bishop's conclusional statement that Plaintiff would have difficulty maintaining employment, Dr. Bishop's examination and findings disclose only moderate symptoms or limitations. Notably, these limitations are consistent with the ALJ's RFC finding that Plaintiff could perform work that was restricted to simple, routine, and repetitive tasks involving only simple work related decisions, and routine workplace changes with only occasional interaction with the public and coworkers and only occasional supervision. In short, the ALJ accounted for Plaintiff's moderate mental limitations with these restrictions.

These restrictions, which accounted for Plaintiff's mental limitations, were included in the hypothetical question to the VE. The VE took these restrictions into account when he provided his opinion that Plaintiff could perform her past relevant work as an injection molding machine tender, machine operator and electronics assembler. The VE also took these restrictions into account when he provided his further opinion that a person with Plaintiff's restrictions could perform other jobs existing in significant

numbers in the national economy such as commercial or institutional cleaner, hospital cleaner, housekeeping cleaner and marker.

Accordingly, the ALJ's determination that Plaintiff was not disabled due to her mental impairments is supported by the substantial evidence of record and, therefore, is due to be affirmed.

## V. CONCLUSION

In light of the foregoing, it is respectfully **RECOMMENDED** that the Commissioner's decision should be **AFFIRMED**.

**IN CHAMBERS** this 15th day of July, 2015.

*s/ Gary R. Jones*
GARY R. JONES
United States Magistrate Judge

## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**